In re James Arvil HOGUE, Sr., Debtor.

Mary S. KLENDA, Guardian of the Estate of Jewell Levone Young, Plaintiff,

v.

James A. HOGUE, Sr., Defendant.

Bankruptcy No. 97–01391–TRC. Adversary No. 97–0140–TRC.

United States Bankruptcy Court, N.D. Oklahoma.

May 22, 1998.

Sidney K. Swinson, Tulsa, OK, Carol J. Russo, Tulsa, OK, for plaintiff.

D. Wm. Jacobus, Tulsa, OK, for defendant.

### ORDER DETERMINING DEBT NONDISCHARGEABLE

TOM R. CORNISH, Bankruptcy Judge.

On the 1st day of May, 1998, this adversary came on for trial. After hearing all the evidence presented and the stipulations of counsel, this Court does hereby enter the following findings and conclusions in conformity with Rule 7052, Fed.R.Bankr.P., in this core proceeding:

The Plaintiff brings this action pursuant to 11 U.S.C. § 523(a)(4), alleging that the Defendant, James A. Hogue, Sr., was guilty of fraud or defalcation while acting in a fiduciary capacity. Mr. Hogue and his wife, Kathleen Hogue, were co-trustees of a revocable inter vivos trust in which Jewell Levone Young was the beneficiary. Mr. Hogue's defense to the adversary was there were never any funds entrusted to him; he had no control of any funds; and no trust funds were ever disbursed by him. Mr. Hogue's counsel argued that even if Hogue did fail to account for the trust funds, he never had control of any funds, so therefore, there could not be a breach of fiduciary duty or defalcation.

### BACKGROUND

James A. Hogue, Sr. received his Bachelor of Science Degree from the University of Tulsa; his juris doctorate from Loyola of New Orleans; and received his L.L.M. in taxation from the University of Texas. He has four sons. He is currently a member of the Oklahoma Bar Association. He established a private law practice in Tulsa, Oklahoma in approximately 1979. From 1979 until becoming a State District Judge in Tulsa County, he specialized in tax matters, bankruptcy, probate and trusts. He also did estate planning for clients. He prepared many trusts, and became the trustee of many of them. He was elected District Judge in November, 1994 and was sworn in as a Judge in January, 1995. He resigned effective January 1, 1997. In his Press Release announcing his resignation, Mr. Hogue stated: "When I ran for office, I wished to be known as 'the people's Judge.' I intended that to mean that I had a responsibility to put myself in the shoes of the people who came into the courtroom for justice and judgment, and to act always in their best interest. To maintain that standard, I must now step aside."

### FINDINGS OF FACT

1. Charles Robert Young, the husband of Jewell Levone Young, passed away on February 27, 1994. Jewell Young was appointed the Personal Representative of Mr. Young's estate, and hired Mr. Hogue to assist her in handling the probate. The probate was filed as Case No. P–94–256 in the District Court of Tulsa County, In the Matter of the Estate of Charles Robert Young, Deceased.

2. A General Inventory and Appraisement was filed in the probate case on June

10, 1994, which listed the following assets and their appraised value:

| | | |
|---|---|---|
| A. | Homestead at 3236 S. Joplin, Tulsa, OK | $ 89,000.00 |
| B. | House at 1441 S. Fulton, Tulsa, OK | $ 57,000.00 |
| C. | Storefront at 5501 E. 15th, Tulsa, OK | $ 50,000.00 |
| D. | Clothing | $ 250.00 |
| E. | 1991 Grand Marquis Automobile | $ 9,500.00 |
| F. | F & M Bank Acct. No. 7217102 | $ 23,035.50 |
| G. | F & M Bank Acct. No. 20239925 | $ 9,711.13 |
| H. | F & M Certificate of Deposit No. 0980172 | $100,000.00 |
| I. | Golden Eagle Federal Credit Union | $ 53,000.00 |

| | |
|---|---|
| Value of Real Property: | $196,000.00 |
| Value of Personal Property and Money | $195,496.63 |
| Total Appraised Value of all estate assets: | $391,496.63 |

The Inventory and Appraisement was signed by Mrs. Young as Personal Representative and was notarized by James A. Hogue. The Appraisers shown on that instrument were Kathleen M. Hogue, Stephanie J. Cockrum, and Kenneth V. Todd, all of Tulsa County, OK.

3. On September 7, 1994, there was signed by the Honorable David E. Winslow, District Judge, an "Order Allowing Final Accounting, Distribution and Discharge." It showed that Mrs. Young appeared with her attorney, James A. Hogue. The Court determined that the heirs of Charles Robert Young, deceased, were his surviving wife, Jewell Levone Young, and his son, Robert Dale Young. The Order reflects that the total probate estate consisted of the three tracts of real property with a value of $196,000.00; 1991 Grand Marquis, $9,500.00, and clothing and personal effects, $250.00, or a total probate of $205,750.00. There was no mention in the Final Account nor any explanation of the cash listed in the Inventory and Appraisement in the amount of $185,746.63.

4. On the same day that Mrs. Young was discharged as Personal Representative in the probate case, there was prepared by Mr. Hogue a Revocable Inter Vivos Trust of Jewell Levone Young, dated September 7, 1994 and notarized on the same day, by James A. Hogue.

5. On October 28, 1994, there was an Amendment prepared to the Trust in which Mrs. Young, the Trustee, added or appointed James A. Hogue, her attorney, and his wife, Kathleen M. Hogue, to serve as co-trustees with Mrs. Young. The "Acceptance of Trustees" was signed by Mr. Hogue, Kathleen Hogue and Mrs. Young.

6. A Memorandum of Trust, dated September 11, 1996, was filed in the Tulsa County Clerk's Office and was signed by Mr. and Mrs. Hogue and Mrs. Young. This Court notes that Mrs. Young's signature is hardly legible and differs significantly from her signature on September 7, 1994. This Court does not infer that the signature is a forgery, but only notes that it appears that her physical condition may have deteriorated substantially from 1994.

7. A written "Resignation of Trustee" was signed by Mr. and Mrs. Hogue on an instrument dated December 17, 1996. This "Resignation as Trustee" was not filed in Case No. PG-96-400, In the Matter of the Guardianship of Jewell Levone Young, Incapacitated, until February 12, 1997.

8. On July 28, 1997, Mr. Hogue executed an Affidavit which included the following sworn statement:

" . . . .

3. Shortly after my election as a District Judge in Office No. 10 of the Fourteenth Judicial District, I informed Ms. Young that I would not be able to act as a trustee because of my office as Judge.

4. At no time did I handle funds or property of the trust estate.

Further, affiant sayeth not . . . "

9. Mr. and Mrs. Hogue were both charged with multiple felonies in the District Court of Tulsa County. Mrs. Hogue pled guilty and is now serving a sentence in the Department of Corrections. Mr. Hogue went to trial and was acquitted in February, 1998.

10. Mary Klenda was a next door neighbor of Mrs. Young for many years. Ms. Klenda and her husband moved away in 1990, but continued to own and rent the house next door to Mrs. Young. She kept in touch with Mrs. Young even after she moved from the neighborhood. Ms. Klenda was acquainted with Mrs. Young's health condition and her finances. She became suspicious when Mrs. Young advised her that she was going to have to move to a nursing home, even though she wished to stay at home. Mrs. Young required 24-hour nursing care in her home and this had been

provided. Ms. Klenda thought that were sufficient assets remaining after Mr. Young's death to adequately provide for health care for Mrs. Young at her home. After making contacts with the Tulsa University Law Clinic and the Department of Human Services, Ms. Klenda was appointed as Guardian of Mrs. Young and asked for an accounting from the trustees of the trust. Pursuant to an Application in the Guardianship case, in November, 1996, an Order was entered freezing the trust account funds.

Mrs. Young had full-time care in her home since 1994, except during the time she was in the nursing home, and turned 91 years of age on March 15, 1998. When Ms. Klenda was appointed Guardian in November, 1996, Mrs. Young's health had deteriorated and she had been moved out of her home of 50 years to a nursing home. She was recovering from a broken hip and a laceration which occurred while a resident of the nursing home. Ms. Klenda testified that Mrs. Young had bed sores and a "broken spirit." Mrs. Young's house was listed for sale and most of her clothing, furniture and appliances had already been sold.

Ms. Klenda stated that as a result of an accounting, at least $154,000.00 of money was spent. She believes that there was more money spent than that but the Court makes no finding in that regard.

11. Ms. Klenda was not aware that Mr. Hogue had any control over the checking accounts. She has not looked at all of the check books, so she has no knowledge of any checks which were signed by Mr. Hogue. In Ms. Klenda's investigation with her attorneys, Ms. Russo and Mr. Boyd, she did determine that money flowed from the F & M Bank to Local America and then some money went into a bank account which was the attorney operating account of Hogue and Associates.

12. Mrs. Young returned to her home in January, 1998. Her son, Robert Dale Young, is presently incarcerated in the Oklahoma Department of Corrections. In order to have 24–hour nursing care, it has been necessary for Mrs. Young to take on another person to share the nursing expense in her home. The total nursing expense is $4,000 .00 per month and Mrs. Young pays $2,000.00 of that amount.

13. In his Press Release announcing his resignation, Mr. Hogue stated: "While I knew nothing about the details of the transactions involved, as long as my name was listed as a co-trustee, I share the fiduciary responsibility. I should have exercised greater personal oversight. Failure to stay informed makes me culpable."

14. On December 17, 1996, there was prepared a Stipulation for Consent of Judgment which was executed and signed by Mary S. Klenda, Guardian; James A. Hogue, Sr.; Kathleen M. Hogue; John L. Boyd and Carol J. Russo, attorneys for the Guardian; and M.M. McDougal and John Street, attorneys for the Hogues. In this Stipulation, the Hogues agreed to pay the Guardian of Mrs. Young the sum of $175,000.00 in exchange for a release of claims the Guardian might have against the Hogues. The $175,000.00 was broken down as $28,000.00 in attorney fees to be payable to the Guardian for her attorney fees, with the balance, $147,000.00, to be paid "to said Guardian for the funds that were defalcated from the ward, Jewell Levone Young, and the revocable inter vivos trust of Jewell Levone Young, and were used for the benefit of James A. Hogue, Sr., and Kathleen M. Hogue."

The Stipulation further provides:

James A. Hogue, Sr., denies actual knowledge of the expenditures and there is not any evidence that has been discovered to indicate he misappropriated funds directly from the Trust Estate; however, he had a duty to know and he breached his fiduciary duties as a Co–Trustee; therefore, he is responsible with his wife and Co–Trustee, Kathleen M. Hogue, in the settled agreed amount of One Hundred Seventy-five Thousand Dollars ($175,000.00), with each of them being jointly and severally liable therefor.

The Stipulation further provided that $50,000.00 would be paid to the Guardian by December 20, 1996 and the balance to be paid by January 17, 1997. Nothing has been paid pursuant to that agreement.

15. On December 17, 1996, in the Guardianship case, Case No. PG–96–400, Judge David E. Winslow approved a Journal Entry of Judgment and the "Stipulation Letter" referred to above. Judge Winslow, pursuant to a Journal Entry submitted to him and approved by Ms. Klenda, Mr. and Mrs. Hogue, Mr. Boyd and Ms. Russo, and Mr. McDougal and Mr. Street, made a finding that "the material allegations in the Guardian's Petition are true as to Kathleen M. Hogue, who admits she misappropriated trust funds and diverted them to the Hogues' benefit; the Court recognizes that James A. Hogue, Sr. denies actual knowledge of such misappropriations and, except as stated in the Stipulation Letter, on the First page, enumerated Paragraph 2., the Court makes no finding in connection therewith; there has been a defalcation of Trust funds in the settled sum of One Hundred Forty-seven Thousand Dollars ($147,000.00), and the Guardian has incurred attorneys' fees and other expenses to recover the defalcated funds, in the settled sum of Twenty-eight Thousand Dollars ($28,000.00),..."

16. In the Journal Entry of Judgment, Judge Winslow further stated: "IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Guardian, Mary S. Klenda, have and recover Judgment against James A. Hogue, Sr. and Kathleen M. Hogue as and for damages for the misappropriation of Trust funds from the REVOCABLE INTER VIVOS TRUST OF JEWELL LEVONE YOUNG, said misappropriation *constituting a defalcation as a matter of law* (emphasis supplied) in the amount of One Hundred Forty-seven Thousand Dollars ($147,000.00) plus attorneys' fees and costs in the amount of Twenty-eight Thousand Dollars ($28,000.00) for a total Judgment in the sum of One Hundred Seventy-five Thousand Dollars ($175,000.00), for which each of them is jointly and severally liable." The Journal Entry further provided that the Hogues be removed as trustees.

17. Mr. Hogue only visited in person with Mrs. Young on two occasions and talked to her by phone once from the time he was appointed as co-trustee until his Court-ordered resignation. He never checked with Mrs. Young's care-givers or physicians.

18. Mr. Hogue testified that he told Mrs. Young around Christmas of 1994 that he was resigning as trustee because he could not act as trustee as a District Judge. This conversation took place in Mrs. Young's home. There were no witnesses to this conversation, other than Mr. and Mrs. Hogue and this 87 year old woman. This Court does not believe this communication took place. Oklahoma law requires that a resignation be in writing. Mr. Hogue testified he couldn't recall the Oklahoma statutory law regarding resignation as a trustee. He stated that he never petitioned the District Court of Tulsa County to resign as trustee, nor did he ever send a letter to F & M Bank advising them of his intent to resign. Mr. Hogue admitted that some of the money from Mrs. Young's trust account went into his law firm operating account. He stated that he was the signatory on the operating account and that he signed all but a few of the checks that went out of the law firm account. He stated that Mrs. Hogue prepared some of the checks out of the law firm account which he signed. He further stated that he didn't always look at the checks before he signed them. Mr. Hogue later testified that his wife, Kathleen Hogue, forged his name on some of the checks from the law firm account.

19. Mr. Hogue recalled one specific deposit of $3,400 to his law firm account from the trust funds and shortly thereafter a $3,400 check was written out of the law firm to pay an American Express bill for family and personal charges. Mr. Hogue said that he didn't know where the money came from into the law firm account to pay the American Express bill until November, 1997 when he was reviewing questionable checks with his attorneys.

20. Mr. Hogue stated that he did not examine any of the bank accounts of Mrs. Young until November, 1997, after the Guardian filed an action for accounting and removal of Mr. and Mrs. Hogue as trustees.

21. After his election as District Judge in November, 1994, Mr. Hogue stated that he did not exercise any control; execute any

documents; or make any decisions with respect to the trust.

22. In 1994, the last year Mr. Hogue practiced law and was campaigning and successfully elected to office, his taxable income was between $10,000 and $11,000. His judicial salary commencing in January, 1995, was approximately $70,000 per year. Mr. Hogue stated that he did not notice a change in lifestyle of his family after he became a Judge. He replaced older cars with newer cars and stated that he traveled more than in previous years. His kids remained at the same schools, and his oldest son went to college in Boston where he received more than half of his expenses by scholarship. Mr. and Mrs. Hogue refinanced their home and obtained approximately $36,000, which Mr. Hogue testified went to pay off certain credit card debt and to have tuition to send one of his sons to military school in Georgia.

23. The Fifteenth Street property of Mrs. Young was sold in September, 1995. Mrs. Young had a rental house which was also sold.

24. Mr. Hogue commenced a Chapter 7 bankruptcy proceeding in the Northern District of Oklahoma on March 28, 1997. He listed creditors holding unsecured non-priority claims in the amount of $337,018. This included the $175,000 judgment of Ms. Klenda. These debts include credit card debt in excess of $21,200 and personal loans from individuals totaling $85,000.

25. Mrs. Young and Mrs. Hogue were the signatories on the bank account at Local America Bank in an account styled "Jewell L. Young or Kathleen M. Hogue." The trust account on which Mrs. Young and Mr. and Mrs. Hogue were signatories, is located at F & M Bank.

26. Neither Ms. Klenda or Mr. Hogue introduced any checks or deposit slips from any of Ms. Young's accounts or the accounts from Mr. Hogue's law office. Mr. Hogue remained as trustee for the Freddie L. Hunt Children's Trust after he became District Judge. Mr. Hogue testified at a hearing on assets, under oath, that he was unaware of substantial cash infusion of money into various accounts of the Hogues. At that same hearing, he testified that he served as sole trustee for six additional trusts from 1994 until 1996. He says that all these trusts have now been closed. Mr. Hogue testified at his hearing on assets that the money received from refinancing his house went to pay off an MBNA bill and to send one of his boys to military school in Gainesville, Georgia. Mr. Hogue testified that the approximate $147,000 that went from the trust to his family was spent on "expenses." At the asset hearing, Mr. Hogue stated "I wasn't aware of a bunch of money being infused into our household."

27. The following sworn testimony was given by Mr. Hogue at a hearing before Judge Winslow on December 17, 1996 (direct examination—questions being asked by Mr. Boyd):

Q. And you understand that this claim runs not only against you but against your wife, Kathleen?

A. Yes, I do.

Q. Now, we have been discussing for the last two weeks some settlement of this question; is that correct?

A. That's my understanding.

Q. And it's my understanding from your lawyers that you have admitted there's been a defalcation?

A. That is my understanding.

Q. And it's my understanding that the defalcation has been settled, more or less, on the figure of a hundred and forty-seven thousand dollars?

A. That is my understanding.

Page 8, Lines 4–16, Transcript of Proceedings in the District Court for Tulsa County, State of Oklahoma, in Case No. PG–96–400, In the Matter of the Guardianship of Jewell Levone Young, Incapacitated, December 17, 1996.

Q. You agree that these funds are due to the guardian of the estate of Jewell Levone Young?

A. Yes.

Q. And are you, at this time, willing to allow a judgment to be entered against you in that amount?

A. Yes.

Page 9, Lines 9–14, Transcript of Proceedings, December 17, 1996

On cross-examination by his lawyer, Mr. McDougal, the following transpired:

Q. The stipulation and agreement includes a statement that you deny actual knowledge of any of the expenditures or of any of the transactions involving Mrs. Young or her trust funds; is that correct?

A. That is correct.

Q. You were not aware of them at that time?

A. I wasn't aware of any of these transactions until sitting in your office, Mr. McDougal, I think as you well know.

Q. Yes, sir.

And we have discussed and you have agreed that, as the co-trustee, you had the duty to have known what was going on in the trust and you're accepting that responsibility and the liability?

A. Yes, sir.

Page 10, Lines 12–25, Transcript of Proceedings, December 17, 1996

On examination by Mr. Boyd, the following transpired:

Q. Mr. Hogue—or, Judge Hogue, the question, of course, is that this is, let's say, a hundred and forty-seven thousand dollars going into the family account for the benefit of the family. That is a great deal more—that's twice as much as a judge makes at this time in two years. Do you understand that?

A. It certainly is.

Q. And it's my understanding this money came in over about a two-year period of time; is that correct?

A. That's correct.

Q. Am I to understand that you do not have a habit in your home of reviewing the accounts of the family at any time?

A. That is correct.

Q. Do you realize that your take-home salary was roughly three thousand three hundred dollars or something like that from a check of about six thousand dollars?

A. Thirty-eight hundred.

Q. Well, and you agree that a hundred and forty-seven thousand dollars is a lot of money—

A. No question.

Q. —in two years?

A. No question.

Page 13, Lines 23–25 and Page 14, Lines 1–19, Transcript of Proceedings, December 17, 1996

28. Mr. Hogue admitted during the criminal trial that it was a big mistake for him not to resign.

29. The Court finds that many of Mr. Hogue's responses to questions elicited by Ms. Klenda's counsel were evasive, unresponsive and uncooperative. Mr. Hogue's attitude and demeanor throughout the proceedings could very well be described as sanctimonious, pontifical, pompous and arrogant. There has not been a shred of evidence offered by Mr. Hogue that would remotely demonstrate even the slightest feeling of remorse for his non-action as co-trustee and for the liquidation of Mrs. Young's assets.

30. The testimony of Mr. Hogue generally follows a conjured up scheme that his wife was solely responsible for liquidating Mrs. Young's assets. And these actions by Mrs. Hogue forced Mrs. Young into extreme destitution in a nursing home. This was after living in the same home for over 50 years. This scenario of events defies credibility and is not believable. To allow his wife to "fall on the sword;" enter a plea of guilty; and go to prison is not commendable in this Court's judgment.

31. The Court is aware that Mr. Hogue was found not guilty by a jury of his peers on multiple felony counts. This Court truly believes in the jury system and certainly has no criticism or opinion about that verdict. Mr. Hogue did not say he was found not guilty in the criminal case. He stated that he was "exonerated." This Court must respectfully disagree with Mr. Hogue's interpretation of that jury verdict. However, the standard of proof in a criminal case is "guilty beyond a reasonable doubt" and obviously, the jury found that they could not convict Mr. Hogue

on the evidence presented. However, the burden of proof in this proceeding is "by a preponderance of the evidence" which is certainly a lesser standard than is applied in a criminal case.

32. While Mr. Hogue defiantly denies knowledge of many of his wife's activities, there is evidence before this Court, by a preponderance of the evidence, that he knew of certain funds that went into his law firm account and participated in the withdrawal of those funds to pay credit card debt, long after the collection of any legal fees through that account.

33. For the calendar years 1995 and 1996, Mr. Hogue and his family had income of approximately $313,200. which is broken down as follows:

| | | |
|---|---|---:|
| a. | Judicial Salary ($70,000 per year) | $140,000 |
| b. | Proceeds from the refinancing of his home | 36,000 |
| c. | Funds from Young trust | 147,000 |
| d. | Trustee's fees from Young trust ($300 per month) | 7,200 |
| e. | Trustee's fees from other trusts | Unknown |
| f. | Mrs. Hogues' income | Unknown |
| | | $313,200 |

This was for the two years after 1994 in which Hogue testified he had taxable income of $11,000 from his law practice. Mr. Hogue's desire to bury his head in the sand and be oblivious to all the wrongdoing going on around him defies logic. It certainly arouses the suspicions of this Court.

For Mr. Hogue to tell this Court and other courts under oath that he was unaware of this infusion of money to benefit him and his family is an insult to the intelligence of the Judges of the state courts as well as this Court. This Court therefore finds by a preponderance of the evidence that a substantial portion of Mr. Hogue's testimony is not credible.

## CONCLUSIONS OF LAW

A. Section 523(a)(4) of the Bankruptcy Code provides a "discharge under § 727 ... of this title does not discharge an individual debtor from any debt ... for ... defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). "[A] finding of nondischargeability under § 523(a)(4) requires a showing of (1) the existence of a fiduciary relationship between the debtor and the objecting party, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship." *Antlers Roof–Truss and Builders Supply v. Storie (In re Storie)* 216 B.R. 283, 286 (10th Cir. BAP 1997) (citing *Fowler Bros. v. Young (In re Young)* 91 F.3d 1367, 1371 (10th Cir.1996)). The existence of the fiduciary relationship is a threshold issue to be determined under § 523(a)(4). *Id.* The question of fiduciary status is one of federal law; however, state law is important when determining whether a trust relationship exists. *Discount Home Center, Inc. v. Turner (In re Turner)*, 134 B.R. 646, 649 (Bankr.N.D.Okla.1991) (quoting *In re Black,* 787 F.2d 503, 506 (10th Cir.1986)). Both state and federal law must be consulted and somehow accommodated in making such a determination. *Id.*

B. The Plaintiff has the burden of proof to establish these elements by a preponderance of the evidence. *Holaday v. Seay (In re Seay)*, 215 B.R. 780 (10th Cir. BAP 1997) (citing *Nelson v. Tsamasfyros (In re Tsamasfyros)*, 940 F.2d 605, 605 (10th Cir.1991); *Medved v. Novak (In re Novak)*, 97 B.R. 47, 58 (Bankr.D.Kan.1987)). Exceptions to discharge are to be narrowly construed. *Id.* (quoting *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997)). "[A]n express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4)." *Young* at 1371 (citations omitted). Hogue admits that he was the co-trustee and that this was an express trust. Therefore, the Plaintiff has established that a fiduciary relationship exists between the parties.

C. Mr. Hogue argues that he resigned as co-trustee shortly after he was elected as a state judge. He allegedly told Mrs. Young that he could no longer serve as co-trustee since he had been elected judge. Mr. Hogue believed, at this point, that he had resigned. However, he did not make any writing to that effect until December 17, 1996 which was filed February 12, 1997. He never petitioned the state court to resign as co-trustee. The trust documents are silent regarding the procedure for resignation. Okla.Stat.Ann. tit. 60, § 175.38 (West 1994) provides:

Upon petition of any trustee of an express trust, a court having jurisdiction may

accept his resignation, and discharge him from the trust upon such terms as the rights of the persons interested in the execution of the trust may require.

On September 11, 1996, Mr. Hogue signed a Memorandum of Trust, which reflected he was a co-trustee. Mr. Hogue testified that he signed the Memorandum because it was merely an administrative act. He could have executed a formal resignation or filed the trust documents rather than filing a Memorandum of Trust. Further, in Mr. Hogue's testimony in his criminal trial in February, 1998, he admitted it was a big mistake that he did not resign. The Court finds Mr. Hogue's testimony that he resigned in 1994 to be unbelievable. Further, the Court finds that Mr. Hogue resigned on December 17, 1996, the date of the written resignation. If he had actually resigned, he would not have signed the Memorandum of Trust. As a result, Mr. Hogue's argument that he resigned as co-trustee in 1994 is without merit.

■ D. "Defalcation" is not defined in the Bankruptcy Code. *Storie* at 286. The Court, in *Storie*, traced the history of "defalcation" and determined that a defalcation exists where a fiduciary fails to account for funds that have been entrusted to him due to a breach of a fiduciary duty, whether intentional, wilful, reckless or negligent. *Storie* at 288. Fiduciaries are charged with a knowledge of the law and its duties. *Id.*

■ "Once the creditor objecting to the dischargeability of a debt under section 523(a)(4) has met its burden of showing that the debtor is a fiduciary and that its debt has arisen because the debtor-fiduciary has not paid the creditor funds entrusted to it, *Young*, 91 F.3d at 1371, the burden then shifts to the debtor-fiduciary to render an accounting to show that it complied with its fiduciary duties." *Id.* (citations omitted).

■ A fiduciary is "under a duty to administer its trust with such skill and care as a person of ordinary prudence would use in dealing with his or her own property." *Storie* at 289. When a fiduciary acts contrary to the standard of care, regardless of whether the action is intentional, reckless or negligent, the act must be a defalcation. *Id.* The Court further noted:

It would simply be against public policy to allow persons occupying fiduciary relations to be excused for debts which arise as a result of their failure to act according to the standard of care imposed on them by law.

*Id.* Debts arising from breaches of their fiduciary duty are nondischargeable. *Id.* at 290.

E. Okla.Stat.Ann. tit. 60, § 175.17(West 1994) provides in pertinent part as follows:

Unless it is otherwise provided by the trust instrument, or an amendment thereof, or by court order:

A. Any power vested in three or more trustees may be exercised by a majority of such trustees; but no trustee who has not joined in exercising a power shall be liable to the beneficiaries or to others for the consequences of such exercise, nor shall a dissenting trustee be liable for the consequences of an act in which he joins at the direction of the majority trustees, if he expressed his dissent in writing to any of his cotrustees at or before the time of such joinder.

\* \* \*

C. Any cotrustee may give a power of attorney to another trustee or authorize a cotrustee to perform any act in the administration of the trust, but such trustee giving a power of attorney or authorizing an act to be performed by his cotrustee shall have the same liability and responsibility as if he, himself, had performed the act done pursuant to such authorization.

D. Nothing in this section shall excuse a cotrustee from liability for inactivity in the administration of the trust, nor for failure to attempt to prevent a breach of trust.

■ F. The Debtor clearly committed a defalcation. A co-trustee is liable for inactivity in the administration of a trust. The Debtor, in his press release, stated he shared the "fiduciary responsibility . . . [and][f]ailure to stay informed makes me culpable." Hogue recalled one instance where the trust funds were deposited into his law firm account which were then used to pay an Ameri-

can Express bill. He signed the check which was written to American Express. Further, Hogue testified that he had a duty to know what was going on with the trust and he accepted that liability. In the Stipulation Letter, Hogue agreed that he had a duty to know and that he breached his fiduciary duties as co-trustee. It is unbelievable that Mr. Hogue had no idea that twice his annual salary, within two years, was being infused into his family. A person of ordinary prudence would have realized this and further, a person of ordinary prudence would have looked more closely at the assets of the trust to determine why substantial sums had been diminished in a relatively short period. The Court finds that the Debtor committed a defalcation while acting in a fiduciary capacity and therefore, pursuant to § 523(a)(4), finds that the debt is nondischargeable.

IT IS THEREFORE ORDERED that the debt to the Plaintiff is **nondischargeable**. A separate Judgment will be entered herein.