**In re Jeffrey Owen SCHOEN, Debtor,**

**Tulsa Spine and Specialty Hospital, L.L.C., Plaintiff,**

v.

**Jeffrey Owen Schoen, Defendant.**

**Bankruptcy No. 08–11292–WV.**
**Adversary No. 08–01083–WV.**

United States Bankruptcy Court, W.D. Oklahoma.

July 6, 2009.

Jay C. Baker, Broken Arrow, OK, John N. Brewer, Law Office of John Brewer, Oklahoma City, OK, for Plaintiff.

B. David Sisson, Norman, OK, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

T.M. WEAVER, Bankruptcy Judge.

This matter came on for trial on the adversary complaint of the plaintiff Tulsa Spine and Specialty Hospital, L.L.C., seeking a determination that the debt at issue is nondischargeable under 11 U.S.C. § 523(a)(4) and (6).[1] After evidence was presented and closing arguments made, the court requested supplemental briefing. Now, having considered the supplemental briefs submitted, the other submissions of the parties and argument of counsel, and after having reviewed the evidence and applicable law, the court issues the following findings of fact and conclusions of law in accordance with FED.R.CIV.P. 52, which

is made applicable to these proceedings by FED.R.BANKR.P. 7052.

### Jurisdictional Statement

This court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the order of the District Court authorizing referral of proceedings to the bankruptcy judges. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and, to the extent the proceeding may be noncore, the parties have consented to the entry of final judgment by this court.

### Findings of Fact

1. On March 31, 2008 ("the petition date"), the debtor and defendant herein, Jeffrey Owen Schoen ("the debtor"), filed his voluntary bankruptcy petition seeking relief under Chapter 7 of the United States Bankruptcy Code.

2. On September 29, 2005, Traci L. Schoen ("Traci"), the now deceased spouse of the debtor, was admitted to Tulsa Spine and Specialty Hospital, L.L.C. ("the hospital") for back surgery.

3. At the time of her admission to the hospital, Traci was insured under a Blue Cross/BlueShield health insurance policy issued to the debtor in connection with his employment.

4. As part of the admission process, before the hospital rendered any services to Traci and at the request of hospital personnel, Traci and the debtor executed a number of documents relating to the debtor's health insurance coverage. Included in these documents were the following:

---

1. Unless otherwise specified, all references to sections herein are to title 11 of the United States Code.

(a) "Admission Agreement" (the hospital's Exhibit 2), which was executed by Traci. The agreement contains a provision by which payments from third party insurers were assigned to the hospital.

(b) "Security Agreement for Patient's Health–Care–Insurance Receivable" (the hospital's Exhibit 1), which was executed by Traci. The agreement provides in part that the patient grants to the hospital a security interest in any health care insurance receivable arising from the patient's hospitalization. It further states in paragraph 4:

In the event that any obligation secured by this Agreement is paid to the Patient, the Patient shall promptly remit all such proceeds received to the Hospital to be applied toward payment of the obligations secured by this Agreement. Until the Patient's remittance of such proceeds to the Hospital, such proceeds shall be deemed to be held in trust by the Patient for and as the property of the Hospital.

(c) "Security Agreement for Guarantor's Health–Care–Insurance Receivable" (the hospital's Exhibit 3), which was executed by the debtor. The provisions of this agreement are identical to those of the hospital's Exhibit 2, except the signer is referred to as "Guarantor" instead of "Patient." Thus, it purports to grant to the hospital a security interest in any health care insurance receivable arising from the hospitalization of Traci. The agreement further states in paragraph 4:

In the event that any obligation secured by this Agreement is paid to the Guarantor, the Guarantor shall promptly remit all such proceeds received to the Hospital to be applied toward payment of the obligations secured by this Agreement. Until the Guarantor's remittance of such proceeds to the Hospital, such proceeds shall be deemed to be held in trust by the Guarantor for and as the property of the Hospital.

5. The debtor did not read the security agreement that he signed.

6. The hospital's witness testified that it was the hospital's policy to explain the various admission documents to those who are being requested to sign them.

7. Following Traci's admission to the hospital, the hospital rendered services to her in connection with back surgery performed on her.

8. The services provided by the hospital to Traci were covered under the debtor's Blue Cross/BlueShield insurance policy,

9. The hospital's charges for Traci's hospitalization, after appropriate adjustments, were $93,774.49.

10. The hospital did not have a contractual arrangement with Blue Cross/Blue Shield ("the insurer"), and as a consequence, the hospital was deemed by the insurer as an "out-of-network" provider. For that reason, the insurer did not make payment to the hospital for the covered expenses of Traci's hospitalization. Rather, the insurer made payment directly to the policy holder, the debtor.

11. Payment for the covered expenses of Traci's hospitalization was made by the insurer's check, dated January 12, 2006, payable to the debtor in the amount of $91,340.92 (the hospital's Exhibit 6).

12. The check was mailed to the following address, which appears on the face of the check:

C/O TRACI SCHOEN 1815

N BOOMER RD 121

STILLWATER, OK 74175

This address was that of the debtor, and the debtor received the check.

13. Traci and the debtor were living apart from each other at the time the debtor received the check. Traci was then living in the State of Texas.

14. Traci requested that the debtor endorse the check and mail it to her so that she could pay the hospital bill.

15. As requested, the debtor endorsed the Blue Cross/Blue Shield check and mailed it to Traci.

16. In two instances in the past when Traci had been a patient in the same hospital, insurance checks had been made payable to the debtor, who endorsed the checks and gave them to Traci. In both instances Traci had paid the hospital with the proceeds of the checks.

17. In endorsing and sending the subject check to Traci, the debtor believed that Traci would pay the hospital with the proceeds of the check in the same manner she had handled the previous checks.

18. Contrary to the debtor's expectation, Traci did not make any payment to the hospital. She deposited the insurance check in her bank and wired $7,000.00, from the check proceeds to the debtor. There has been no accounting of the remaining proceeds of the check.

19. During their marriage, Traci had handled the payment of the couple's household bills. However, she had not always handled these matters responsibly, having written insufficient funds checks and having failed to make necessary car payments.

20. Traci's financial irresponsibility was the reason the debtor gave for the couple's marital difficulties and the separation that followed Traci's surgery.

21. The debtor testified that Traci wired the $7,000.00, to him as reimbursement for money Traci had taken from him.

22. The debtor testified that Traci had not previously taken any money from him.

23. The hospital sued the debtor and Traci for the expenses of Traci's hospitalization.

24. On March 10, 2006, the hospital recovered judgment, by default, against the debtor and Traci, jointly and severally, in Tulsa County, Oklahoma District Court, in the amount of $93,774.49, plus attorney fees (the hospital's Exhibit 7). The judgment includes findings that the debtor and Traci "fraudulently" failed to pay the hospital and "fraudulently" retained the insurance proceeds.

*Conclusions of Law and Discussion*

A. Section 523(a)(4) Claim

The exception to dischargeability on which the hospital principally relies is § 523(a)(4) of the Bankruptcy Code. This section states, in relevant part, that "a discharge under section 727 … of this title does not discharge an individual debtor from any debt … for … defalcation

while acting in a fiduciary capacity ...." § 523(a)(4). Accordingly, a finding of non-dischargeability under § 523(a)(4) requires a showing of (1) the existence of a fiduciary relationship between the debtor and the objecting party, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371 (10 th Cir.1996). The party seeking a determination that a debt is not dischargeable bears the burden to prove these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The question of fiduciary status is one of federal law; however, state law is important when determining whether a trust relationship exists. *Discount Home Ctr. v. Turner (In re Turner)*, 134 B.R. 646 (Bankr.N.D.Okla.1991). "The existence of a fiduciary relationship is a threshold issue to be determined under § 523(a)(4)." *Klenda v. Hogue (In re Hogue)*, 221 B.R. 786, 793 (Bankr.N.D.Okla.1998). The Tenth Circuit has taken a very narrow view of the concept of fiduciary duty under this section.

Under Tenth Circuit law, to find a fiduciary relationship exists the court must find that the money or property on which the debt at issue was based was entrusted to the debtor. *Allen v. Romero (In re Romero)*, 535 F.2d 618 (10 th Cir. 1976). See *In re Young*, 91 F.3d at 1371. In addition, the subject matter of the trust, the res, must be identifiable. *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 787 (10th Cir. BAP 1997). An express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4). *Fowler & Peth, Inc. v. Regan (In re Regan)*, 477 F.3d 1209 (10th Cir.2007).

The trust relationship must have existed before, and independent of, the defalcation which created the debt. *In re Young*, 91 F.3d at 1372; *Solar Systems & Peripherals, Inc. v. Burress (In re Burress)*, 245 B.R. 871, 878 (Bankr.D.Colo. 2000); *United Food & Commercial Workers Union Local 1995 v. Eldridge (In re Eldridge)*, 210 B.R. 188, 192 (Bankr. N.D.Ala.1997). It is this requirement that distinguishes the express or technical trust implicated in Section 523(a)(4) from a constructive trust which is imposed by a court because of wrongdoing. "A trust imposed *ex-maleficio* ... springs into existence from the very act of wrongdoing and is applied constructively as a remedy for wrongdoing to prevent unjust enrichment." *Freeman v. Frick (In re Frick)*, 207 B.R. 731, 734 (Bankr.N.D.Fla.1997). Thus, constructive trusts do not result in the fiduciary relationship required by Section 523(a)(4). *Lewis v. Short (In re Short)*, 818 F.2d 693, 695 (9 th Cir.1987).

The hospital asserts that the security agreement that the debtor signed evidences the creation of an express trust between the debtor, the purported guarantor of his wife's hospital bill, and the hospital.[2] The document provides that the debtor grants to the hospital a security interest in any health-care-insurance receivable arising from the hospital's providing goods and services to his wife, the patient. It also requires that the debtor "promptly remit" to the hospital all health insurance proceeds he receives, for application to the amounts owed to the hospital. The specific provision, found in paragraph 4 of the security agreement, which purportedly creates the express trust states, "Until the Guarantor's remittance of such proceeds to the Hospital, such proceeds

---

**2.** While the security agreement refers to the debtor as "guarantor", the document does not explicitly state that the debtor guarantees payment of his wife's medical expenses.

shall be deemed to be held in trust by the Guarantor for and as the property of the Hospital."

 In determining whether an express trust was created by a writing, substance controls over form. That a document has language purporting to create a trust is inconclusive. The court must look behind the document to determine the true nature of the relationship. *Ford Motor Credit Co. v. Talcott (In re Talcott)*, 29 B.R. 874, 878 (Bankr.D.Kan.1983). Thus, the fact that the subject security agreement provides that the insurance proceeds should be deemed to be held in trust by the debtor as property of the hospital does not necessarily make it so. It must be determined whether the essential attributes of a trust are present.

First and foremost, there must be a trust *res*. Since the security agreement provides that the debtor shall hold the insurance proceeds in trust, it might seem that the insurance proceeds would be the trust *res*. However, at the time the security agreement was executed by the debtor, and the trust allegedly created, there were no insurance proceeds in existence. The hospital retorts that it was the contractual right to the insurance proceeds which constituted the trust *res*. However, the security agreement is devoid of any provision that the debtor's right to the insurance proceeds would be held in trust. It was only the proceeds that were deemed to be held in trust according to the wording of the agreement. There being no insurance proceeds when the purported trust was created, it is clear that the essential element of a trust res is missing from the purported trust.

It is equally clear that when the security agreement is considered in its entirety, no true trust relationship was created thereby. The word "trust" is used only one time in the entire agreement. The word appears in the language previously quoted that the insurance proceeds "shall be deemed to be held in trust." The remaining provisions in the security agreement relate to the security interest in the health insurance proceeds granted to the hospital. It states that, should the debtor fail to perform any part of the agreement (including, presumably, the purported obligation to hold the insurance proceeds in trust), the hospital may enforce its rights under the agreement by foreclosure pursuant to the Oklahoma Uniform Commercial Code. This provision and (except for the one reference to a trust) the remaining provisions in the agreement are typical of security agreements generally. Considering the tenor of the security agreement as a whole, the court must conclude that the agreement evidences nothing more than a financing arrangement between the hospital and the debtor. The debtor granted to the hospital a security interest in the health insurance proceeds to secure the debtor's purported guarantee of his wife's hospital bill. Upon the debtor's failure to promptly remit the insurance proceeds to the hospital after receiving them, the hospital was entitled to exercise the remedy of foreclosure. The added language that the insurance proceeds are deemed to be held in trust does not change what is a financing arrangement into an express trust giving rise to the fiduciary relationship required under § 523(a)(4).

Because the purported trust is lacking a *res* and the purported trust document is nothing more than a security agreement, the hospital's § 523(a)(4) claim must fail.

### B. Section 523(a)(6) Claim.

As an alternative basis for nondischargeability, the hospital asserts a claim under § 523(a)(6). It posits that the debtor's endorsement of the health insurance check and his sending it to his wife, rather than paying the check proceeds to the hospital,

constituted a willful and malicious injury to the hospital or its property.

In order to prove the nondischargeability of a debt under § 523(a)(6), the plaintiff must demonstrate that the debt at issue is for "willful and malicious injury by the debtor to another entity or to the property of another entity." To prove a "willful" injury, the plaintiff must prove a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. The distinction is similar to the category of *intentional* torts as compared to *reckless* or *negligent* torts. Intentional torts generally require that the actor intend the consequences of an act, not simply the act itself. *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)(citing RESTATEMENT (SECOND)OF TORTS § 8A, commenta). A "willful" act, therefore, is one in which the debtor must "desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it." *Panalis v. Moore (In re Moore),* 357 F.3d 1125, 1129 (10th Cir.2004)(quoting *Mitsubishi Motors Credit of America, Inc., v. Longley (In re Longley),* 235 B.R. 651, 657 (10th Cir. BAP 1999)). As to the element of malice, "[a] malicious injury occurs when there is proof that the debtor either intended the resulting injury or intentionally took action that was substantially certain to cause the injury." *Moore,* 357 F.3d at 1129. This presents a subjective test: "the court must determine what the debtor knew or intended with respect to the consequences of his actions." *McCain Foods USA Inc. v. Shore (In re Shore),* 317 B.R. 536, 542 (10th Cir. BAP 2004).

In order to prevail under the § 523(a)(6) exception in this case, the hospital must establish that, when the debtor sent the endorsed insurance check to his wife, he intended thereby to injure the hospital. While the debtor's reliance on his wife to pay the bill was misplaced, the court finds credible his testimony that, when he sent the endorsed check to his wife, he believed she would pay the hospital bill with the proceeds of the check. She had paid previous bills to the same hospital with the proceeds of insurance checks handled in a similar manner. The hospital has produced no evidence tending to show that the debtor intended, or intentionally took action that was substantially certain, to injure the hospital with respect to the handling of the subject check. For these reasons, the debtor's § 523(a)(6) action must fail.

## C. Collateral Estoppel

Finally, the hospital argues that the doctrine of collateral estoppel should be applied to preclude further consideration of the issue of the dischargeability of the subject debt. It points to the judgment it obtained against the debtor and Traci containing findings that the judgment debtors "fraudulently" failed to pay the hospital and retained the insurance proceeds. However, the hospital's position lacks merit for several reasons.

It is well-settled that the doctrine of collateral estoppel applies in dischargeability actions under § 523(a). *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See Nelson v. Tsamasfyros (In re Tsamasfyros),* 940 F.2d 605 (10 th Cir.1991); *Tway v. Tway (In re Tway),* 161 B.R. 274 (Bankr. W.D.Okla.1993). This doctrine states that a "right, question, or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit by the same parties or their privies." *Southern Pac. R.R. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897). Although the bankruptcy court in a dischargeability

action under § 523(a) ultimately determines whether or not a debt is dischargeable, issue preclusion may be invoked to bar relitigation of the factual issues underlying the determination of dischargeability. *See Klemens v. Wallace (In re Wallace)*, 840 F.2d 762 (10th Cir.1988).

Three elements must be present in order to apply collateral estoppel in the bankruptcy context: (1) the issue sought to be precluded must be the same as that involved in the prior action, (2) the issue must have been actually litigated; and, (3) the determination of the issue must have been essential to the final judgment. *Tsamasfyros*, 940 F.2d at 605; *Tway*, 161 B.R. at 277–78. The party asserting collateral estoppel bears the burden to prove all of the required elements. *Johnson v. Miera (In re Miera)*, 926 F.2d 741 (8 th Cir.1991). *See Evans v. Dunston (In re Dunston)*, 146 B.R. 269 (D.Colo. 1992). In this case, the judgment entered against the debtor and Traci followed their default. Consequently, the issues purporting to relate to issues of nondischargeability in this case were not actually litigated. In addition, the findings of "fraud" do not make any reference to a fiduciary or trust relationship or a willful and [07] malicious injury. Thus, there were no findings, even by default, regarding the elements of the § 523(a)(4) or § 523(a)(6) exceptions to discharge upon which the hospital relies in its adversary complaint.

The court finds, therefore, that the hospital has totally failed to produce evidence that any of the required elements for the application of collateral estoppel are present. Thus, it has failed to sustain its burden of proof on this issue.

### Conclusion

For all of the above reasons, the court rules in favor of the debtor and against the hospital on all of the hospital's claims. An appropriate judgment shall issue.