**In re Stephen J. MERRILL, d/b/a Merrill & Associates, a/d/b/a Key Energy Resources, Inc., Debtor.**

**Lori Ann Merrill, Individually and as Parent and Next Friend of April Michelle Merrill, Plaintiff,**

**v.**

**Stephen J. Merrill, Defendant.**

**Bankruptcy No. 99–01456–M.**

**Adversary No. 99–0132–M.**

United States Bankruptcy Court, N.D. Oklahoma.

March 27, 2000.

John B. Nicks, Tulsa, OK, for plaintiff.

Mark A. Craige, Tulsa, OK, for defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

THIS MATTER came before the Court for trial on February 17, 2000. Plaintiff Lori Ann Merrill ("Plaintiff" or "Ms. Merrill") appeared personally and through her attorney, John B. Nicks. Defendant Stephen J. Merrill ("Defendant" or "Mr. Merrill") appeared by and through his attorney, Mark A. Craige. The Court received

evidence and heard argument from the parties. The Court also considered the facts stipulated to by the parties in the Pre–Trial Order filed in this action on December 15, 1999. At the conclusion of the trial, the Court provided the parties with an opportunity to submit post-trial briefs, the last of which was received on or about March 3, 2000. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. § 1334(b) (West 2000).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C.A. § 157(a) (West 2000). This is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(I) (West 2000).

### Burden of Proof

■■ The United States Court of Appeals for the Tenth Circuit has ruled that

Exceptions to discharge are to be narrowly construed, so as to effect the "fresh start" purpose of bankruptcy. *Jones*, 9 F.3d at 880. The policy underlying § 523(a)(5), however, favors enforcement of familial support obligations over a "fresh start" for the debtor. *Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 722 (10th Cir.1993). "Further, the objector to discharge has the burden of proving by a preponderance of the evidence that a debt is not dischargeable." *Jones*, 9 F.3d at 880.

*See In re Miller*, 55 F.3d 1487, 1489 (10th Cir.1995), *cert. denied* 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995). Accordingly, the burden of proof in this adversary proceeding falls upon the Plaintiff.

### Findings of Fact

Plaintiff and Defendant were married on or about May 23, 1980, in Tulsa, Oklahoma.

Three children were born of the marriage. On December 22, 1992, Ms. Merrill filed an action for divorce (the "Divorce Action") in the District Court in and for Tulsa County, Oklahoma (the "State Court"). The Divorce Action was hotly contested from its inception. On January 8, 1993, the State Court entered a Temporary Support Order (the "First TSO"). Under the terms of the First TSO, Defendant was ordered to pay Plaintiff the sum of $2,500.00 per month in temporary support, of which $1,146.00 was determined to be temporary child support. The balance of $1,354.00 per month was characterized in the First TSO as "temporary alimony." *See Plaintiff's Exhibit 2, Modified Temporary Restraining Order filed February 8, 1993, p. 3, ¶ 9.* On April 22, 1993, the State Court issued an Additional Temporary Order and Directions (the "Second TSO"). Under the terms of the Second TSO, Defendant was ordered to continue to pay Plaintiff the sum of $2,500.00 per month in temporary support. Of that sum, $1,146.00 was again characterized as temporary child support, and the State Court ruled that "[t]he characterization of the portion of those funds not attributable to child support shall be determined at the time of trial." *See Plaintiff's Exhibit 2, Additional Temporary Order and Directions, filed June 22, 1993, p. 5.* On January 10, 1994, the State Court denied a request by Mr. Merrill to modify the Second TSO. *See Plaintiff's Exhibit 3.*

It took the parties and the State Court over four years to bring the Divorce Action to completion. The Divorce Action was tried intermittently over a one and one-half year period, beginning in December of 1994, and concluding in July of 1996. Thereafter, on January 2, 1997, the State Court entered its Decree of Divorce (the "Decree").[2] *See Plaintiff's Exhibit 1.* In

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2000).

2. The record before the Court is a bit confusing as to the actual date of the Decree. Although the Decree bears an internal date of August 8, 1996, it bears a file stamp date of January 2, 1997.

the Decree, the State Court divided the assets accumulated by the parties during the marriage, allocating marital assets valued at $122,512.00 to Plaintiff and $155,513.00 to Defendant. The assets awarded to Defendant included a Mercedes automobile, a law practice known as Merrill and Associates, an individual retirement account, and all right, title and interest in a marital asset known as Key Energy Resources. *See id. at p. 32.* As a result of the $33,021.00 difference, Plaintiff was awarded an additional money judgment of $16,510.00 against Defendant. *See id.*

Mr. Merrill failed to pay to Ms. Merrill all of the sums as ordered by the State Court pursuant to the First TSO and the Second TSO. At trial, Mr. Merrill argued that the amounts due and unpaid under the First TSO and/or the Second TSO should be reduced or eliminated in their entirety. In the Decree, the State Court made the following findings regarding those monies:

The Court will next deal with the issue of arrearages under the Temporary Order. In the Temporary Order, the Defendant [Mr. Merrill] was ordered to pay Plaintiff [Ms. Merrill] temporary child support in the amount of $1,146.00, and temporary alimony in the amount of $1,354.00 per month, commencing January 11, 1993. The Court imputed $800.00 in monthly income to Plaintiff, and found the Defendant's Monthly Income to be $4,000.00. The relevant percentages were set at eighty-three percent (83%) for Defendant and seventeen percent (17%) for Plaintiff for payment of medical and child care expenses.

In that Order, language was included which reflects that the support obligations were subject to adjustments, "retroactively or prospectively, in the event the Defendant obtains verification from the Plaintiff's employer that the Plaintiff's actual gross monthly income exceeds $800.00 per month."

Based upon testimony and evidence, it appears that Plaintiff's gross income was at least $2,158.00 as of January 10, 1994, at the time of the hearing on a Motion to Modify. According to relevant case authority, most recently *Gray v. Gray,* found at Volume 67, Oklahoma Bar Journal, page 2328, this Court has the authority to retroactively modify temporary support payments.

In the instant case, based upon the facts, and circumstances, the Court modifies the Temporary Order as to child support and the relevant percentages effective January 10, 1994. Using the $4,000.00 income figure for Defendant, and the figure of $2,158.00 for Plaintiff, the Defendant's child support obligation is modified to $755.00 per month, effective February, 1994. As such, the Defendant over paid child support by $6,256.00 from February, 1994, through June, 1995. The Defendant's arrearage for June, 1995, is $190.63, and $648.61 for July, 1995. The Defendant owes $10,570.00 for the period October, 1995, through November, 1996. Total child support arrearage is $5,153.24, plus interest at the statutory rate of ten percent (10%), per Section 114 of Title 43.

In addition, the Court will adjust the arrearages due for child care. According to various Plaintiff's and Defendant's exhibits, specifically Plaintiff's 15, 16, 32, 33, 70, 75, and 77, as well as Defendant's 10, 50, 51, and 52, the child care arrearage was $13,409.00 from May, 1994 through August, 1996. Based upon the Court's adjustment of the relevant percentage found [sic] eighty-three percent (83%) to sixty-five percent (65%), the Court finds the amount of the arrearage to be $10,501.00. The Court declines Defendant's request for further adjustment or a set-off for child care incurred by him during periods the children were in his custody.

Plaintiff is not required to find the lowest child care costs available. The custodial parent is to take the best interest of the child into account in making child care determinations, citing *Minnich v. Minnich,* 898 P.2d 747, decided

by the Oklahoma Court of Appeals in 1995.

The Court will make a similar adjustment for the medical expense arrearage, reducing it to $3,804.00.

As to the issue of support alimony, it should be noted that the original figure was set at $1,354.00 per month. The figure was based upon expenses of $3,300.00 and income of $800.00, plus $1,146.00 in child support. Based upon the Court's review of Plaintiff's Exhibit 46, it appears that Plaintiff's disposable income was $1,155.00, an increase of $355.00. The readjustment of the child care amount downward approximates the increase in disposable income. Accordingly, the Defendant's request for an adjustment of the support alimony is denied. The arrearage is $33,850.00 through November of 1996.

The arrearages are reflected as follows, to recap: Child Support, $5,153.00; child care, $10,501.00; medical expense, $3,804.00; support alimony, $33,850.00.

The Court also declines Defendant's request for an adjustment as to the automobile insurance and the life insurance. Those amounts are reflected as $672.00 and $3,483.00 respectively. The total of the arrearages will amount to $57,463.00. The arrearages will draw interest at the statutory rate until paid, and judgment is rendered accordingly. The Court finds that the referenced arrearages were ordered to be paid for the support and maintenance of the Plaintiff and the minor children.

*See Plaintiff's Exhibit 1, pp. 28–30.* The State Court went on to issue a judgment in favor of Plaintiff and against Defendant for each of those amounts. *See id., p. 40.* These amounts shall hereafter be collectively referred to as the "Support Payments."

In the Divorce Action, the State Court also addressed an issue relating to an account located at Fidelity Investments (the "Fidelity Account"). The State Court made the following findings and conclusions with respect to the Fidelity Account:

The Court will next address the issue of the Fidelity Investment account in the name of April Merrill. A trust account was opened with Fidelity in the name of April Merrill. According to the Defendant's testimony, the account was established by virtue of the Stephen J. Merrill Family Trust, which was created in February, 1984. The Defendant was reflected as trustee, along with J.C. Merrill. The trust document was introduced as Defendant's Exhibit 21.

According to the language of the trust document, the trustees were given the authority to "engage in any oil, gas, and other mineral business, as long as, in the discretion of the trustees, it is advisable or expedient, and is potentially profitable."

Based upon the Defendant's testimony, he was engaged in the oil and gas business for many years. Defendant testified that the funds were removed from the account and invested in the Blake Estate Prospect, along with funds of the parties. The investment was not as profitable as had been anticipated. It appears that production revenue was deposited in the Merrill and Associates account and utilized for [illegible on exhibit] obligations. Based upon a review of the facts and circumstances, the Court declines to order the Defendant to repay the Fidelity account.

*Id. at p. 28.* The evidence presented to this Court indicated that the documentation submitted to Fidelity established the Fidelity Account under the Oklahoma Uniform Gifts to Minors Act, Okla.Stat.Ann. tit. 58, § 1201 *et seq.* (West 2000) (the "UGMA" or "UTMA"). The Court heard contradictory testimony as to whether both Plaintiff and Defendant intended the Fidelity Account to be established under the UGMA. Plaintiff testified that both she and Defendant were aware of that fact and intended the Fidelity Account to be governed by the UGMA. Defendant testified that he never had any such intention, and that the documents submitted to Fidelity

were altered (presumably by the Plaintiff) after he had signed them in order to make the Fidelity Account subject to the UGMA.

The decision of the State Court as set forth in the Divorce Decree was appealed by both parties to the Court of Civil Appeals of the State of Oklahoma (the "Court of Appeals"). On August 28, 1998, the Court of Appeals issued its decision affirming in part and reversing in part the decision of the State Court. *See Plaintiff's Exhibit 6.* The Court of Appeals rejected Defendant's argument that the amount of the Support Payments set forth in the Decree should be reduced, and affirmed the State Court with respect to the same. Plaintiff appealed that portion of the Decree which ruled that Defendant was not required to repay to Plaintiff (for the benefit of April Merrill) the amounts originally contained in the Fidelity Account. On this point, the Court of Appeals reversed the decision of the State Court. The pertinent portion of the opinion of the Court of Appeals reads as follows:

> On her counter-appeal, Wife first argues that the trial court failed to comply with provisions of the Oklahoma Uniform Transfers to Minors Act, 58 O.S.Supp.1996 §§ 1201–23. In support of that argument, Wife says that Husband improperly withdrew $9,000 from a custodial UTMA account set up for the benefit of the couple's eldest child and used the money for oil and gas investment. The account was set up October, 1986, and listed Husband as its sole custodian by the abbreviated appellation "Stephen J. Merrill Cust/April Michelle Merrill UGMA[sic]." According to one of Wife's exhibits, Husband "redeemed" $9,000 from the account in April, 1989, leaving there only slightly more than $300.

> Husband replies that he took revenue from a distribution of overriding royalty and, as he was permitted to do under the terms of a separate Clifford trust into which the distribution had been paid, "temporarily invested" those funds in the UTMA account. He argues that once he as custodian delivered money from the UTMA account back to the trustee of the Clifford trust (i.e., Husband as custodian took money from the UTMA account and paid it to himself as trustee of the family Clifford trust), he had fulfilled his legal obligation and was discharged from any potential liability.

> We do not agree. The Act was passed in order to facilitate the easy inter vivos transfer of assets to minors, unencumbered by restrictions on investments, formal accounting, and the like. *Gulmen v. Gulmen,* 913 S.W.2d 852, 854 (Mo.App.), *reh'g/transfer denied; transfer denied* (1996). But, once made, a gift to the minor is irrevocable, and the minor is indefeasibly vested with rights to the property, subject only to the custodian's powers and duties elsewhere provided in the Act. 58 O.S.1991 § 1212(B); *see In re Marriage of Hendricks,* 681 N.E.2d 777, 781 (1997); *Williams v. Williams,* 1998 ME 32, ¶ 13, 706 A.2d 1038, 1040.

> The custodian's powers and duties in Oklahoma are defined in § 1213: He *shall* "collect, hold, manage, invest, and reinvest custodial property"; and, he *shall* "observe the standard of care that would be observed by a prudent person dealing with property of another." The UTMA does not contemplate that a separate trust instrument should govern how a minor's property will be handled, even if funds from the trust are used to create the UTMA account. The property given to a minor under the UTMA remains hers and no custodian may "redeem" the bulk of those funds, as Husband says he did, and invest the money according to what is permitted by the separate trust agreement.

> We therefore hold that Husband was wrong to take money from his daughter's UTMA account, and the trial court erred when it said Husband did not have to reimburse that account for the money taken. We therefore reverse so much of the trial court's decree as said Husband had no obligation to reimburse the

UTMA account, and we remand this case to the trial court for consideration of what amount from Husband would replenish the account. The amount of reimbursement must include the principal amount withdrawn and, at least, a reasonable amount of interest or other compensation for loss of what might have been earned had the fund remained intact.

*See Id. at pp. 16–18* (footnote omitted) (emphasis in original). In so ruling, the Court of Appeals determined that the Fidelity Account was created pursuant to the UGMA, and was governed by its terms.

The decision of the Court of Appeals was appealed to the Oklahoma Supreme Court.[3] On January 21, 1999, the Oklahoma Supreme Court denied *certiorari* and refused to hear the appeal. *See Plaintiff's Exhibit 7.* The decision of the Court of Appeals is final and not subject to further review.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

Ms. Merrill asks the Court to determine that the Support Payments constitute non-dischargeable alimony, maintenance or support under the terms of § 523(a)(5) of the Bankruptcy Code. Mr. Merrill concedes that the following Support Obligations are not dischargeable:

1. The child support arrearage for June, 1995 though November, 1996, in the amount of $5,153.24, plus interest at the rate of ten percent (10%);

2. The day care arrearage from May, 1994, through August, 1996, in the amount of $10,501.00; and

3. The children's medical expense arrearage in the amount of $3,804.00.

*See Answer, Docket No. 6,* ¶ 2. The following portions of the Support Payments remain at issue:

1. Automobile insurance in the amount of $672.00;

2. Life insurance in the amount of $3,483.00; and

3. The support alimony arrearage in the amount of $33,850.00.

*See id.* Ms. Merrill also seeks a ruling that the amount which Mr. Merrill took from the Fidelity Account be found to be non-dischargeable under § 523(a)(4).[4]

### § 523(a)(5)

In order to determine whether all or any part of the Decree Obligations are non-dischargeable under § 523(a)(5), this Court must apply the following two-part test:

> *In re Sampson,* decided subsequent to the bankruptcy court's ruling below, held that a bankruptcy court must conduct a two-part inquiry when resolving the issue of whether payments from one spouse to another incident to divorce settlement are in the nature of support. First, the court must divine the spouses' shared intent as to the nature of the payment. This inquiry is not limited to the words of the settlement agreement, even if unambiguous. Indeed, the bankruptcy court is required to look behind the words and labels of the agreement in resolving this issue. Second, if the court decides that the payment was intended as support, it must then determine that the substance of the payment was in the

---

**3.** The record before this Court does not establish which of the parties sought further review of the decision of the Court of Appeals.

**4.** As the Court issues its ruling, it draws heavily from two of its recent decisions dealing with dischargeability under § 523(a)(5), namely *Polishuk v. Polishuk (In re Polishuk),*

243 B.R. 408 (Bankr.N.D.Okla.1999) and *Jenkins v. Jenkins (In re Jenkins),* Adv.Proc. No. 99–0149–M (Mem.Op.Feb.8, 2000). Certain of the language from these two opinions may appear *verbatim* in this Memorandum Opinion without citation to the opinion from which it is drawn, as both are the original works of this Court.

nature of support at the time of the divorce—i.e., whether the surrounding facts and circumstances, especially financial, lend support to such a finding. *See In re Young*, 35 F.3d 499, 500 (10th Cir.1994) (hereafter *"Young"*), *citing In re Sampson*, 997 F.2d 717, 722–26 (10th Cir. 1993). Our Court of Appeals has held that "[t]his determination must be made by looking at the substance of the agreement 'viewed in the crucible of surrounding circumstances.'" *See Yeates v. Yeates (In re Yeates)*, 807 F.2d 874, 878 (10th Cir.1986) (citation omitted). The obligation at issue need not be in the form of a direct payment. An obligation of one ex-spouse to hold the other harmless from the payment of a joint debt may also be considered a support obligation. *See id.* at 877 (holding such obligations to be non-dischargeable); *see also See Dewey v. Dewey (In re Dewey)*, 223 B.R. 559, 564–65 (10th Cir. BAP 1998), *aff'd*, 202 F.3d 281 (10th Cir.1999) (hereafter *"Dewey"*). The questions of non-dischargeability and priority of alimony, maintenance and support are questions of federal, not state, law, although a bankruptcy court may look to state law for guidance on these issues. *See Jones v. Jones (In re Jones)*, 9 F.3d 878, 880 (10th Cir.1993). Where the payments at issue are the result of a contested trial on the issues, as opposed to an agreement between the parties, the bankruptcy court looks to the intent of the trial court, and not the parties, with respect to the payments at issue. *See Engram v. MacDonald (In re MacDonald)*, 194 B.R. 283, 287 (Bankr.N.D.Ga.1996) ("If, as in the instant case, the divorce decree were obtained by agreement between the parties, the intent of the parties is the focus. If the divorce proceeding were contested, the intent of the trier of fact is the focus.") (citation omitted); *see also West v. West (In re West)*, 95 B.R. 395, 399 (Bankr. E.D.Va.1989) (same).

*Auto Insurance*

On April 22, 1993, the State Court ordered Mr. Merrill to pay for the insurance on a 1984 Buick automobile which was in the possession of the Plaintiff. *See Plaintiff's Exhibit 5, p. 142, lines 6 – 24*. In the Decree, the State Court ordered Mr. Merrill to pay to Ms. Merrill the sum of $672.00 in unpaid auto insurance premiums. As it did so, the State Court expressly ruled that this amount was "for the support and maintenance of the Plaintiff and the minor children." *See Plaintiff's Exhibit 1, pp. 30 and 41*. This ruling was affirmed by the Court of Appeals. *See Plaintiff's Exhibit 6*. This Court need look no further than the Decree to determine the intended nature of Defendant's obligation to pay the auto insurance.

■■■ The second prong of the *Sampson* test requires the Court to "determine [whether] the substance of the payment was in the nature of support at the time of the divorce." *See Young*, 35 F.3d at 500. This Court finds the analysis contained in *Dewey* of assistance here. In *Dewey*, the creditor (ex-spouse) objected to confirmation of debtor's proposed Chapter 13 plan because the plan did not treat the debtor's hold harmless obligations to the ex-spouse as a priority claim under § 507(a)(7). The bankruptcy court sustained the objection, finding that the hold harmless obligation was in the nature of support. As it affirmed the bankruptcy court, the Bankruptcy Appellate Panel undertook the following analysis:

> As noted above, the Tenth Circuit has stated that "support" is to be interpreted broadly, and that "[t]he critical question in determining whether the obligation is, in substance, support is 'the function served by the obligation at the time of the divorce.'" *Sampson*, 997 F.2d at 725–26 (quoting *In re Gianakas*, 917 F.2d 759, 763 (3rd Cir.1990)); *see Jones*, 9 F.3d at 881–82 ("support" is interpreted broadly). This function may be determined by considering the relative financial circumstances of the parties at the time of the divorce, and a former spouse's "need for support at the time of the divorce is sufficient to presume that the parties intended the obli-

gation as support." *Sampson*, 997 F.2d at 726 n. 7. Here the bankruptcy court found that Dewey was in need of support and that she gave up monthly support payments in return for the Debtor's agreement to pay the joint Husband's Debts. These factual findings are not clearly erroneous. Thus, *since the function served by the Debtor's payment of the Husband's Debts was to relieve Dewey of any joint obligation on the debts so as to allow her to use her limited income to support herself; it "had the actual effect of providing support to [Dewey]—enabling her to ... have a monthly income." Sylvester*, 865 F.2d at 1166 (quotation omitted) (quoted in *Sampson*, 997 F.2d at 726); *see Yeates*, 807 F.2d at 879 (*"When the agreement is ambiguous, evidence that payment of the debt is necessary in order for the plaintiff to maintain daily necessities such as food, housing and transportation indicates that the parties intended the debt to be in the nature of support."*). *See Dewey*, 223 B.R. at 565–66 (emphasis added). Under this rationale, the Court must consider the "function served" by that portion of the Decree which ordered Mr. Merrill to pay the automobile insurance.

■ At the time it entered both the First TSO and the Second TSO, as well as during the trial of the Divorce Action, the State Court considered and reconsidered the income and expenses of both Plaintiff and Defendant. This Court concludes that the purpose behind requiring Mr. Merrill to pay the auto insurance was to ensure that Ms. Merrill would not have to pay the same, and to ensure that her income (including that which she received from Mr. Merrill) would be available to pay her expenses and service her debts. Accordingly, the Court concludes that the obligation to pay auto insurance in the amount of $672.00 constitutes support under § 523(a)(5), and is not dischargeable.

*Life Insurance*

■ The State Court ordered Mr. Merrill to "timely pay, maintain, and keep in effect, all life insurance policies on both parties" as part of the Second TSO. *See Plaintiff's Exhibit 2*. In the Decree, the State Court found that Mr. Merrill had failed to do so, and ordered Mr. Merrill to pay Ms. Merrill the sum of $3,483.00, representing the amount of such unpaid life insurance premiums. As it did so, the State Court expressly ruled that these amounts had been ordered to be paid "for the support and maintenance of the Plaintiff and the minor children." *See Plaintiff's Exhibit 1, pp. 30–31 and 41*. This ruling was affirmed by the Court of Appeals. *See Plaintiff's Exhibit 6*.

Several bankruptcy courts have held that life insurance which "has the effect of providing support and ensuring a home for the former spouse and children in the event of the untimely demise" of the debtor/spouse is non-dischargeable. *See Pierce v. Pierce (In re Pierce)*, 142 B.R. 308, 310 (Bankr.E.D.Ark.1992); *see also In re Grijalva*, 72 B.R. 334, 337 (S.D.W.Va. 1987) (life insurance non-dischargeable "safety net of the child support and alimony"). In the present case, neither the death benefit amount nor the monthly premium for these insurance policies is part of the record. However, there can be little doubt that the major if not the sole purpose of life insurance is to provide monies to replace the income stream lost upon the demise of a breadwinner. The face amount of the policies at issue, whether large or small, would serve that purpose to some degree.

Defendant argues that the life insurance payments did not actually operate to support the Plaintiff or the parties' children because

During this time period, Debtor [Mr. Merrill] did not, in fact, die. Even if Debtor had died during the pendency of the divorce, ex-wife and his children would have inherited everything and, as is readily ascertainable from the extensive Decree of Divorce, there was [sic] certainly sufficient marital assets to cover Debtor's obligations. Therefore, there was no need to insure anything.

*See Debtor's Trial Brief at p. 17.* The argument is unsound. The fact that someone did not die during a specific period of time does not mean that life insurance was unnecessary to protect against the risk. Under Defendant's line of thought, health insurance is prudent only for the sick, disability insurance only for the careless and auto insurance only for those contemplating a traffic accident. The purpose of the life insurance was to provide a means to pay the obligations under the First TSO and the Second TSO (short of liquidation of Mr. Merrill's assets) in the event of his death. That purpose was served by the life insurance, even though Mr. Merrill did not die.[5] The Court concludes that the obligation of Mr. Merrill to provide life insurance for the benefit of Ms. Merrill is in the nature of support, and is thus non-dischargeable under § 523(a)(5).

*The Support Alimony Arrearage*

The largest amount at issue is the "support alimony arrearage" of $33,850.00. This arrearage is the result of Defendant's failure to pay the full amount of the support alimony ordered by the State Court under the terms of the First TSO and the Second TSO. Plaintiff asks this Court for a determination that this amount is non-dischargeable. Defendant argues that notwithstanding its characterization in the Decree, the "support alimony arrearage" is not in the nature of alimony, maintenance or support, and is thus dischargeable under § 523(a)(5). For the reasons set forth below, this Court concludes that the obligation to pay "support alimony arrearage" as set forth in the Decree is non-dischargeable under § 523(a)(5).

At the time it issued the First TSO and the Second TSO, the State Court reserved the right to review the financial positions of both parties, and adjust the amount of these payments should the facts warrant an adjustment. *See Plaintiff's Exhibit 2, First TSO,* ¶ 6. The State Court also deferred a determination as to whether those amounts over and above amounts designated as child support constituted maintenance or property division until the time of trial. *See Plaintiff's Exhibit 2, Second TSO, p. 5.* At trial, the State Court heard significant and detailed evidence regarding the income and expenses of both Plaintiff and Defendant. After hearing such evidence, the State Court made certain adjustments to the amounts owed by Defendant, and clearly and unequivocally stated that these payments "were ordered to be paid for the support and maintenance of the Plaintiff and the minor children." *See Plaintiff's Exhibit 1, pp. 30 and 41.* In addition, the State Court made a complete division of the marital property of Plaintiff and Defendant, and entered a judgment in favor of Plaintiff in the amount of $16,-510.00 in order to reach an equal distribution of property. *See id. at p. 32.* This ruling was affirmed by the Court of Appeals. *See Plaintiff's Exhibit 6.*

This Court need look no further than the Decree to determine the intent of the State Court. This Court presumes that a state court (or any other court, for that matter) means what it says when it enters an order. The State Court intended the support alimony arrearage to be in the nature of support. The Court concludes that the first prong of the *Sampson* test has been met.[6]

**5.** The Court also notes that the Defendant was ordered to maintain life insurance not just on his life, but on the life of Ms. Merrill as well. *See Plaintiff's Exhibit 2, Second TSO, p. 3.* Obviously, if Ms. Merrill had died while the Divorce Action was pending, the proceeds from said insurance would have been critical to the financial support of the parties' children.

**6.** For reasons not made a part of the record herein, the Divorce Action was presided over

by two separate judges during its sojourn through the Oklahoma state court system. Defendant argues that this Court should somehow "parse" the intent of Judge McAllister (the judge who conducted the temporary hearings and issued the First TSO and the Second TSO) and Judge Perugino (the judge who conducted the trial of Divorce Action), as well as conduct what would in effect be a retrial of the issues tried in the temporary hearings, in order to find that the State Court actually intended the support alimony arrear-

With respect to the issue of whether those payments served the function of support, this Court answers the question in the affirmative. As noted above, "[t]he critical question in determining whether the obligation is, in substance, support is 'the function served by the obligation at the time of the divorce.'" *See In re Sampson, supra,* 997 F.2d at 725–26, *quoting In re Gianakas,* 917 F.2d 759, 763 (3rd Cir.1990). The State Court made the following findings in the Decree:

> As to the issue of support alimony, it should be noted that original figure was set at $1,354.00 per month. The figure was based upon expenses of $3,300.00 and income of $800.00, plus $1,146.00 in child support. Based upon the Court's review of Plaintiff's Exhibit 46, it appears that the Plaintiff's disposable income was $1,155.00, an increase of $355.00. The readjustment of the child care amount downward approximates the increase in disposable income. Accordingly, the Defendant's request for an adjustment of the support alimony is denied. The arrearage is $33,850.00 through November of 1996.

*See Plaintiff's Exhibit 1, p. 30.* At the time of the First TSO, Plaintiff's expenses ($3,300.00) exceeded her projected income ($800.00) by $2,500.00 per month. The fact that Defendant was ordered to pay Plaintiff a total of $2,500.00 per month was not mere coincidence; the award provided Plaintiff with sufficient monies to meet her and her children's monthly expenses. At the time of the Decree, the State Court determined that although there was an increase in Plaintiff's income, her need for support had remained constant as a result of reductions in Defendant's child care obligations. This Court concludes that these payments operated in the nature of support; indeed, one would be hard pressed to consider these payments as anything other than support.

age to be in the nature of property settlement. *See Debtor's Trial Brief at pp. 5 – 11.* This

Defendant contends that the "support alimony arrearage" is not truly in the nature of support because: (1) Ms. Merrill had significant personal income during the time in question; (2) she survived even though Mr. Merrill did not pay her these amounts; (3) she had the capacity to earn even more income had she sought to return to the practice of law; and (4) based upon her current financial situation, Ms. Merrill would suffer no hardship if Mr. Merrill were discharged of his obligations. After careful review, the Court rejects each argument.

The State Court considered in great detail the relative income and expenses of the Plaintiff and the Defendant at the time it entered the First TSO, the Second TSO and the trial of the Divorce Action. The income earned by Ms. Merrill and Mr. Merrill was fully considered by the State Court when it established the temporary support payments, and when it entered the Decree. After review of all evidence presented at trial, the State Court concluded that Ms. Merrill had disposable income of $1,155.00 per month during the pendency of the Divorce Action, and based its order of support payments on that income amount. This Court sees no basis to disturb the findings of the State Court in this regard, and will not retry this or any other portion of the Divorce Action.

With respect to Defendant's second argument, the State Court saw no basis to impute to Ms. Merrill an income based upon her abilities and opportunities as an attorney. Neither does this Court. There is no showing that Ms. Merrill has concrete employment opportunities in the legal profession in Tulsa, or that the demands which such a career might place upon her would be in her best interest or the best interest of her children. The State Court based its calculation of Ms. Merrill's income upon the terms of her actual employment. This Court respect-

Court declines to do so.

fully declines to enter into speculation regarding Ms. Merrill's earning capacity and will instead rely upon the factual findings of the State Court, as affirmed by the Court of Appeals.

■ The argument that the payments cannot be considered support because Ms. Merrill survived notwithstanding Mr. Merrill's failure to make payments as ordered is specious. Under Defendant's rationale, the mere fact that the ex-spouse remains alive and kicking justifies discharge of all past due support obligations. If Mr. Merrill is correct, all any debtor need do with respect to payments owed directly to his or her spouse is to default on those payments and seek bankruptcy court relief. Such a result would render § 523(a)(5) a nullity. Finally, the current financial condition of Ms. Merrill is irrelevant to issues under § 523(a)(5). *See Swate v. Hartwell (In re Swate)*, 99 F.3d 1282, 1286 (5th Cir.1996) (and cases cited therein).

*Interest*

The Court must decide whether the interest, penalties and fees that have accrued and are accruing on the Support Obligations should be held non-dischargeable pursuant to § 523(a)(5). The United States Supreme Court found, in addition to the value of money that was actually obtained by fraud, treble damages, attorneys' fees and costs to fall under the discharge exception for actual fraud pursuant to § 523(a)(2)(A). *See Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (hereafter *"Cohen"*). Courts have held that "the status of ancillary obligations such as attorney's fees and interest" are determined by the non-dischargeable nature of "the primary debt," and that therefore fees, costs and interest are ancillary to the non-dischargeable debt and are also non-dischargeable. *See In the Matter of Gober*, 100 F.3d 1195, 1208 (5th Cir. 1996) (and cases cited therein).

■ Section 523(a)(5) excepts from discharge "**any debt** ... to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record...." [7] § 523(a)(5) (emphasis added). Under the reasoning elucidated in *Cohen* "the most straightforward reading" of § 523(a)(5) dictates that once the Support Obligations have been determined to be non-dischargeable under § 523(a)(5), all of the ancillary obligations which are a part of that debt, including interest, fees and penalties accruing or having been accrued, are also non-dischargeable. *See Cohen,* 523 U.S. at 218–19, 118 S.Ct. 1212. The Court finds that to the extent that the Support Obligations accrue interest, such interest is non-dischargeable.

**§ 523(a)(4)**

Ms. Merrill also seeks a determination that the order of the Court of Appeals requiring Mr. Merrill to repay the sums taken from the Fidelity Account is non-dischargeable under § 523(a)(4) of the United States Bankruptcy Code, which provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

§ 523(a)(4). Ms. Merrill argues that the conduct of Mr. Merrill in taking said monies violated his fiduciary duty as trustee to April Merrill under the UGMA, and constitutes "defalcation while acting in a fiduciary capacity" for purposes of § 523(a)(4). Mr. Merrill argues that: (1) notwithstanding the ruling of the Court of Appeals, the Fidelity Account was not governed by the UGMA; (2) his removal of

---

**7.** The Court is aware of the exceptions listed in subsections (A) & (B) of § 523(a)(5) as noted earlier, but finds them inapplicable here. None of the Support Obligations have been assigned, and the Court has determined that they are in the nature of support.

the funds from the Fidelity Account was proper under the terms and provisions of a separate trust instrument; and (3) accordingly, his conduct was not actionable under § 523(a)(4). This Court disagrees with the Defendant, and finds the obligation to repay the monies in the Fidelity Account as ordered by the Court of Appeals to be non-dischargeable.

There can be no doubt that the Court of Appeals found that the Fidelity Account was established pursuant to and was governed by the UGMA, and that Defendant's conduct in taking monies from the Fidelity Account was in violation of his duties under the UGMA. *See Plaintiff's Exhibit 6, pp. 16 – 18.* The Court must first consider whether the finding of the Court of Appeals is binding upon the parties under the doctrine of collateral estoppel. If so, the facts may not, as Mr. Merrill wishes, be revisited by this Court; instead, the Court must concern itself with whether the conduct of *Mr. Merrill gives rise to a non-dischargeable claim under § 523(a)(4).*

■■■■ This Court looks to the laws of the state of Oklahoma to determine the preclusive effect of the decision of the Court of Appeals. The Supreme Court of the United States has ruled that

The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute, which provides that state judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738. This statute directs a federal court to refer to

the preclusion law of the State in which judgment was rendered. "It has long been established that § 1738 does not allow federal courts to employ their own rules of *res judicata* in determining the effect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken."

*Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).[8] Oklahoma courts have ruled that

Under the doctrine of issue preclusion (or collateral estoppel), once a court has decided an issue of fact or law necessary to its judgment, the same parties or their privies may not relitigate the issue in a suit brought upon a different claim. The principle of issue preclusion applies with equal force to jurisdictional as well as to nonjurisdictional questions. It operates to bar from relitigation both correct and erroneous resolutions of jurisdictional challenges but it cannot be made binding on anyone unless the party against whom the earlier decision is interposed had "full and fair opportunity" to litigate the critical issue in the earlier case.

*Fent v. Oklahoma Natural Gas Co.,* 898 P.2d 126, 133 (Okla.1994) (footnotes omitted); *accord, National Diversified Business Services, Inc., v. Corporate Financial Opportunities, Inc.,* 946 P.2d 662, 666–67 (Okla.1997). The operative question is whether Mr. Merrill has been given a "full and fair opportunity" to litigate the nature of the Fidelity Account.

---

8. 28 U.S.C. § 1738 provides as follows:

*1738. State and Territorial statutes and judicial proceedings; full faith and credit*

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto. The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form. Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

■ The Court finds that the issue of the nature of the Fidelity Account was squarely raised in the State Court, and was fully considered by both that court and the Court of Appeals. The State Court determined the issue in favor of Mr. Merrill; had the Court of Appeals affirmed that decision, this Court has no doubt that Mr. Merrill would argue most strenuously that further consideration of the matter was barred by the doctrine of *res judicata.* Accordingly, the Court finds that the following matters are established for the purposes of this adversary proceeding:

1. The Fidelity Account was established under the UGMA;

2. Mr. Merrill was the "sole custodian" of the Fidelity Account. *See Plaintiff's Exhibit 6, p. 16;*

3. Mr. Merrill withdrew $9,000.00 from the account in April of 1989, leaving approximately $300.00 in the Fidelity Account; and

4. The monies taken by Mr. Merrill were invested in an oil and gas venture and ultimately lost.[9]

The Court of Appeals determined that the taking of the funds from the Fidelity Account was done in violation of the UGMA, and ordered Mr. Merrill to repay the same. The question for this Court is whether Mr. Merrill's obligation to repay those funds is non-dischargeable under § 523(a)(4).

The issue of dischargeability under § 523(a)(4) was recently addressed in this district in the somewhat notorious case of *Klenda v. Hogue (In re Hogue),* 221 B.R. 786 (Bankr.N.D.Okla.1998) (hereafter *"Hogue"*). In *Hogue,* certain funds were misappropriated from the Revocable Inter Vivos Trust of Jewell Levone Young (the "Trust"). James A. Hogue ("Mr.Hogue") was one of the trustees of that trust. Both Mr. Hogue and his wife were accused of criminal misconduct in diverting funds from the Trust to their own personal use.

Mrs. Hogue pled guilty to the charges. Mr. Hogue denied any intentional wrongdoing and, after a jury trial, was not convicted of any criminal charge. However, in an action brought by the personal representative of Mrs. Young, Mr. Hogue stipulated to a judgment (the "Consent Judgment") in the amount of $175,000.00, and admitted that his failure to keep himself informed of the use (and misuse) of Trust funds constituted a breach of "his fiduciary duties as a Co-Trustee." *See Hogue,* 221 B.R. at 789. Shortly thereafter, Mr. Hogue filed a petition for relief under Chapter 7 of the Bankruptcy Code and sought to discharge the amounts owing under the Consent Judgment. The personal representative for Mrs. Young filed a complaint alleging that the debt owed to Mrs. Young under the Consent Judgment was nondischargeable under § 523(a)(4).

■ The Court in *Hogue* found the debt under the Consent Judgment to be non-dischargeable. As it did so, it undertook the following analysis:

A. Section 523(a)(4) of the Bankruptcy Code provides a "discharge under § 727 ... of this title does not discharge an individual debtor from any debt ... for ... defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). "[A] finding of nondischargeability under § 523(a)(4) requires a showing of (1) the existence of a fiduciary relationship between the debtor and the objecting party, and (2) a defalcation committed by the debtor in the course of that fiduciary relationship." *Antlers Roof–Truss and Builders Supply v. Storie (In re Storie)* 216 B.R. 283, 286 (10th Cir. BAP 1997) (citing *Fowler Bros. v. Young (In re Young)* 91 F.3d 1367, 1371 (10th Cir. 1996)). The existence of the fiduciary relationship is a threshold issue to be determined under § 523(a)(4). *Id.* The question of fiduciary status is one of federal law; however, state law is im-

---

9. All of these matters, with the exception of whether the Fidelity Account was established under the UGMA, were established without dispute at the trial of this adversary proceeding.

portant when determining whether a trust relationship exists. *Discount Home Center, Inc. v. Turner (In re Turner)*, 134 B.R. 646, 649 (Bankr.N.D.Okla. 1991) (quoting *In re Black*, 787 F.2d 503, 506 (10th Cir.1986)). Both state and federal law must be consulted and somehow accommodated in making such a determination. *Id.*

*Id.* at 793. Judge Cornish went on to define defalcation under § 523(a)(4):

"Defalcation" is not defined in the Bankruptcy Code. *Storie* at 286. The Court, in Storie, traced the history of "defalcation" and determined that a defalcation exists where a fiduciary fails to account for funds that have been entrusted to him due to a breach of a fiduciary duty, whether intentional, wilful, reckless or negligent. *Storie* at 288. Fiduciaries are charged with a knowledge of the law and its duties. *Id.*

"Once the creditor objecting to the dischargeability of a debt under section 523(a)(4) has met its burden of showing that the debtor is a fiduciary and that its debt has arisen because the debtor-fiduciary has not paid the creditor funds entrusted to it, *Young*, 91 F.3d at 1371, the burden then shifts to the debtor-fiduciary to render an accounting to show that it complied with its fiduciary duties." *Id.* (citations omitted). A fiduciary is "under a duty to administer its trust with such skill and care as a person of ordinary prudence would use in dealing with his or her own property." *Storie* at 289. When a fiduciary acts contrary to the standard of care, regardless of whether the action is intentional, reckless or negligent, the act must be a defalcation. *Id.* The Court further noted:

It would simply be against public policy to allow persons occupying fiduciary relations to be excused for debts which arise as a result of their failure to act according to the standard of care imposed on them by law.

*Id.* Debts arising from breaches of their fiduciary duty are nondischargeable. *Id.* at 290.

*Id.* at 794. Other courts have held that the failure of a trustee to observe the terms and conditions of a trust agreement in the handling of monies constitutes defalcation for purposes of § 523(a)(4). *See Central Bank of Denver v. Olinger (In re Olinger)*, 165 B.R. 283, 285–86 (Bankr. D.Colo.1994) (and cases cited therein).

The Court of Appeals ruled that under the UGMA, Mr. Merrill held the position of a fiduciary with respect to the Fidelity Account, and that Mr. Merrill violated his duties under the UGMA when he took funds from the Fidelity Account and invested them in an oil and gas venture.[10] That issue has been fully and fairly litigated, and will not be relitigated herein. Under the standard set forth in *Hogue*, when a fiduciary breaches a duty imposed upon him or her by agreement of the parties or by operation of law, any loss resulting from that breach is non-dischargeable. The trustee's intent matters not. "When a fiduciary acts contrary to the standard of care, regardless of whether the action is intention, reckless or negligent, the act must be a defalcation." *Hogue*, 221 B.R. at 794. Mr. Merrill is charged with knowledge of his duties under the UGMA. Having violated those duties, the resultant loss is non-dischargeable.

A separate judgment is entered concurrent with this Memorandum Opinion.

### JUDGMENT

THIS MATTER came before the Court for trial on February 17, 2000. Plaintiff Lori Ann Merrill appeared personally and through her attorney, John B. Nicks. Defendant Stephen J. Merrill appeared by and through his attorney, Mark A. Craige. The Court received evidence and heard argument from the parties. The Court

---

10. In order to assist an appellate court in the event this decision is appealed, the Court notes that if it were required to relitigate the issue of whether the Fidelity Account was governed by the UGMA and whether Mr. Merrill breached his duties under the UGMA with respect to the Fidelity Account, it would reach the same conclusion as the Court of Appeals.

also considered the facts stipulated to by the parties in the Pre–Trial Order filed in this action on December 15, 1999. At the conclusion of the trial, the Court provided the parties with an opportunity to submit post-trial briefs, the last of which was received on or about March 3, 2000. The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that the following obligations owed by Stephen J. Merrill, Defendant, to Lori Ann Merrill, Plaintiff, contained in the Decree of Divorce entered in Case No. FD–92–8284 in the District Court in and for Tulsa County, Oklahoma are not discharged in the Chapter 7 bankruptcy case of Stephen J. Merrill, Case No. 99–01456–M:

1. The child support arrearage for June, 1995 though November, 1996, in the amount of $5,153.24, plus interest at the rate of ten percent (10%);

2. The day care arrearage from May, 1994, through August, 1996, in the amount of $10,501.00;

3. The children's medical expense arrearage in the amount of $3,804.00;

4. Automobile insurance in the amount of $672.00;

5. Life insurance in the amount of $3,483.00; and

6. The support alimony arrearage in the amount of $33,850.00.

IT IS FURTHER ORDERED that the obligation of Stephen J. Merrill to repay Lori Ann Merrill the monies taken from the Fidelity Account (as that term is defined in the Memorandum Opinion), as set forth in the Judgment of the Court of Civil Appeals of the State of Oklahoma, No. 89,623, entitled Lori Ann Merrill, Plaintiff /Appellee/Counter–Appellant and the State of Oklahoma, ex rel. Department of Human Services, Appellee, vs. Stephen J. Merrill, Defendant/Appellant, Counter–Appellee, be, and the same hereby is, not discharged in the Chapter 7 bankruptcy case of Stephen J. Merrill, Case No. 99–01456–M.

IT IS FURTHER ORDERED that to the extent any of the items set forth above bear interest under the terms of said judgments and/or the laws of the State of Oklahoma, said interest is not discharged in the Chapter 7 bankruptcy case of Stephen J. Merrill, Case No. 99–01456–M.